IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

JEFFREY E. CRUMP                                                                 PLAINTIFF

V.                                  CIVIL ACTION NO.: 1:19-CV-109-SA-DAS

AETNA                                                               DEFENDANT

ORDER AND MEMORANDUM OPINION

Jeffrey E. Crump initiated this action on June 4, 2019, by filing his *pro se* Complaint [1] against Aetna, seeking an extension of his long-term disability ("LTD") benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"). The Defendant filed a Motion for Summary Judgment [34] on June 1, 2020. The Plaintiff did not respond to the Motion [34], and the time to do so has now passed. The Court is prepared to rule.

*Factual and Procedural History*

The Plaintiff was employed with the United Parcel Service, Inc ("UPS") as a driver. The Defendant, Aetna, is an insurance company which supplied UPS with a Group Insurance Policy that insured UPS's long-term disability plan ("LTD plan"). The Plaintiff's participation in the LTD plan became effective on January 1, 2013, as part of his employment with UPS. Thereafter, on or about December 5, 2013, the Plaintiff was involved in a work-related accident, whereby he fell from a truck trailer and sustained a right comminuted tibial plateau fracture with extension into the right tibial shaft. In layman's terms, this is an injury involving a fracture, crack, or break in what the general public would commonly refer to as the shin bone.

The next day, the Plaintiff underwent surgery to attempt to repair the damage. The surgery proved to be more of a mitigation procedure as opposed to a repair. The same day, the Plaintiff underwent a second surgery that involved hardware removal, debridement (surgical term for

cleaning), and installation of an antibiotic drug delivery implant. The surgeon who performed the procedures, Dr. Karl Van Osten III, kept surgical notes which indicated that the Plaintiff's leg "looked very good clinically other than varus alignment,"[1] and was negative for any alarming post-operation indicators. In August 2014, about eight months after the surgeries, the Plaintiff returned to Dr. Van Osten who determined that the leg was exhibiting a significant varus deformity, or in other words, an excessive bow-leg. An x-ray during that visit confirmed that the knee had experienced post-traumatic bone changes during the healing process. However, because of the relatively good mobility of the knee and intact neurological status of the foot, Dr. Van Osten advised that the Plaintiff could engage in primarily seated work.

In September 2014, Aetna started reviewing the Plaintiff's LTD claim application, and he was approved for LTD benefits, retroactively becoming effective on June 5, 2014. The Plaintiff remained under the care of Dr. Van Osten during this time. By December of 2014, the Plaintiff was "doing great" and was able to walk for exercise in thirty-minute intervals multiple times per week. [32]. Despite these physical improvements, the injury took a psychological toll on the Plaintiff. He began treatment with psychiatrist Dr. Chika Iwueke and reported that he felt depressed and also experienced flashbacks and nightmares pertinent to his injury. The Plaintiff was diagnosed with depression and PTSD. Consequentially, he was prescribed medication to improve his psychological condition. He remained under the care of Dr. Iwueke for a prolonged period of time, and his depression and nightmares lessened while under her care.

On February 10, 2015, at the request of Dr. Van Osten, the Plaintiff underwent a functional capacity exam ("FCE") conducted by registered occupational therapist ("OTR") Tanya Steen. The FCE revealed that the Plaintiff's minimal overall level of work fell within the medium range. It

---

[1] A varus alignment is what the general public would refer to as a "bow-leg."

further stated that the "client is able to tolerate medium level of work for the 8-hour day/40-hour week." [32]. The FCE also noted discrepancies in the Plaintiff's reported function and observed functional performance. For example, while the Plaintiff was purportedly reliant on his cane, the OTR found no clinical basis that would require the cane to perform tasks. Furthermore, according to the results of the FCE, the Plaintiff did not display any behavioral issues with pain or complain of any subjective pain to the OTR.

In the latter part of April 2015, Aetna received records from the Plaintiff's counselor, Dr. Palmer, and medical records from Dr. Iwueke. Dr. Palmer's records indicated that the Plaintiff was exhibiting normal mood, affect, speech, thought process, and eye contact during each of four sessions conducted between March and April 2015. Subsequently, during a visit with Dr. Iwueke in May 2015, the Plaintiff reported improved symptoms which were attributed to his medication regimen.

Subsequently, on May 4, 2015, Aetna received an internal health behavioral review which was performed by Christina Pate. In sum, Ms. Pate found that Dr. Iwueke's findings did not support ongoing disability. Additionally, Aetna received updated records from Dr. Van Osten from May 28, 2015, which indicated the Plaintiff exhibited normal range of motion in his knee and that his foot was neurologically intact.

According to the Defendant, the Plaintiff's documented improvements are relevant because the LTD benefits were not intended to last indefinitely. The Policy itself provided in relevant part, that in order to qualify for benefits, the Plaintiff must meet a "Test of Disability." The "Test of Disability" was based on two different standards depending on how long the claimant had been receiving benefits. Specifically, the Policy provides that a claimant qualifies for LTD benefits for an initial period of 24 months if they cannot perform the material duties of their own occupation

3

and their earnings are the same or less than earnings prior to the disability. After this 24-month period expires, the "Test of Disability" changes to a higher standard of whether the claimant can work at "any reasonable occupation." In order to continue receiving benefits after the initial 24-month period, the claimant must show that they are unable, solely because of the illness of injury, to complete the tasks of any reasonable occupation that would yield income of at least 60% of their pre-disability income.

On October 6, 2015, Aetna advised the Plaintiff that it was reviewing whether he would continue to qualify for LTD benefits beyond the initial 24-month period, which was set to expire in June 2016. Three weeks later, Aetna received updated medical records which included the results of a mental status examination conducted by Dr. Iwueke. The examination found that the Plaintiff exhibited normal speech, linear and logical thought content, no abnormal thoughts, intact associations, fair judgment, intact memory, fair attention span and knowledge and full affect. Then in February 2016, Aetna received medical records from Worklink Clinic which detailed an evaluation conducted by Dr. John White, Jr. The evaluation concluded that the Plaintiff could return to modified work as there were no restrictions in lifting, standing, walking, or sitting.

On April 27, 2016, the Plaintiff was referred by Aetna for an internal complex triage to assess his ability to sustain seated work activity. An Aetna medical director, Dr. Brodie, determined that the Plaintiff could participate in seated activities and there were no restrictions in his upper extremities. The day after the internal complex triage, Aetna inquired with Dr. Van Osten on whether he agreed with Dr. Brodie's findings. Dr. Van Osten stated that he believed the Plaintiff could return to work full-time so long as it had a sedentary physical demand level.

Once the Plaintiff's ability to engage in work with a sedentary physical demand level was established, on May 13, 2016, Aetna referred his LTD claim for a transferrable skills analysis

("TSA") to determine the availability of jobs that met the Plaintiff's skills, physical ability, and the Policy's wage-earning requirement. The TSA revealed a myriad of potential sedentary occupations that were located within the Plaintiff's labor market. Within those results were four potential jobs that would allow for work breaks and seating at a chair that was ergonomically correct. The four highlighted occupations from the TSA were: (1) taxicab starter; (2) repair order clerk; (3) assignment clerk; and (4) and surveillance-system monitor. All four of these jobs met the Policy's requisite wage-earning requirement (60% of the Plaintiff's earnings prior to the disability) and were in the Plaintiff's labor market.

The medical evidence conflated with the vocational evidence led Aetna to ultimately terminate the Plaintiff's LTD benefits through a letter dated May 17, 2016. The termination was accompanied by Aetna's acknowledgment that while the Plaintiff could not return to his heavy level occupation, he could not demonstrate that he was disabled from any reasonable occupation, as was required for benefits to continue beyond the initial 24-month period.

On March 29, 2017, the Plaintiff filed an internal appeal of Aetna's decision to terminate his benefits. The appeals process is an internal process conducted by Aetna, which requires that the claimant complete a form explaining the reasons that the claimant believes the decision was incorrect. It also allows the claimant to provide any additional documentation that should be considered.

As part of the comprehensive review of the Plaintiff's benefits during the appeal, Aetna received additional, updated, and thorough medical records from Dr. Iwueke. These records included documentation of the Plaintiff's visits through the entirety of 2016. While the reports indicated that the Plaintiff self-reported worsening symptoms, such as nightmares and anxiety, the reports also contained results of multiple mental status examinations throughout 2016 that showed

cognitive processes that were linear and logical, fair judgment, fair attention span, and normal speech. The records also indicate that during that time, the Plaintiff declined a medication increase and conveyed that the therapy had been effective. He reported improvement, less irritability, and that he was being active by mowing his lawn weekly. The mental status examinations further showed that the Plaintiff was oriented to person, place, and time.

Aetna also obtained from Dr. Moore, a family medicine physician, additional medical records reflecting visits from 2016 and 2017. In sum, during the visits with Dr. Moore, the Plaintiff did not complain about leg pain and denied any symptoms of depression or anxiety. Furthermore, Dr. Moore noted that the Plaintiff did not exhibit any physical manifestations of anxiety, depression, or agitation upon examination. Dr. Moore opined that the Plaintiff's mental health was stable on his medicine regimen.

In order to make an informed decision on whether to grant or deny the Plaintiff's appeal of the termination of LTD benefits, Aetna referred the medical records to Reliable Review Services ("RRS"), a third-party medical review company. Subsequently, in connection with their submission to RRS, Aetna received a report in June 2017 prepared by Dr. Behzad Emad. Dr. Emad confirmed that from the time of injury through August 2014 that the Plaintiff could not perform any tasks. However, he further opined that, by February 10, 2015, the Plaintiff could sit unlimited, stand or walk with a cane up to 1 hour at a time multiple times daily. Dr. Emad's report also stated the Plaintiff could reach above his shoulders unrestricted at desk level, and had carrying, lifting, pushing, and pulling ability. Furthermore, Dr. Emad concluded that there was no medical evidence as of May 29, 2015 to support that the Plaintiff continued to suffer functional impairment at any level.

The RRS referral also yielded a June 8, 2017 report prepared by psychologist Dr. Avila Steele which addressed the Plaintiff's mental health. Dr. Steele opined that the medical evidence failed to establish psychiatric functional impairment from the date of the accident to the date of the report's preparation. She also stated in her report that the medical records showed that the outpatient psychiatry and therapy had been effective, and it was noteworthy that the Plaintiff never had to be committed to an inpatient psychiatric care facility.

On June 16, 2017, Aetna sent copies of Dr. Emad's report to the Plaintiff's personal doctors and requested that they give any relevant information that could supplement the report. Similarly, Aetna sent a letter requesting Dr. Iwueke to review Dr. Steele's report. Thus, the Plaintiff's personal doctors had the opportunity to supplement, contextualize, or refute any of the findings of the third-party review's findings on both the physical and psychological front. Aetna gave them all two weeks to respond, but none of the Plaintiff's personal medical providers responded. Thus, in a letter on July 14, 2017, Aetna wrote the Plaintiff to inform him that it was upholding its decision to terminate his benefits and his appeal was denied. Aetna detailed how the updated medical evidence conflated with Dr. Emad's and Dr. Steele's review helped them reach this decision. This was further supported by the TSA's four alternative sedentary occupations available to the Plaintiff in his work market at the requisite wage level. Aetna therefore determined that the Plaintiff was not disabled from any reasonable occupation and upheld their June 5, 2016 termination of the LTD benefits.

As a last-ditch effort, the Plaintiff submitted a second appeal, by way of a letter dated July 21, 2017. The Plaintiff's letter stated that he would be submitting additional documentation in support of his second appeal. Subsequently, in what appeared to be a showing of good faith, Aetna granted an extension to the Plaintiff to allow him to submit the documentation and placed the

review on hold through October 16, 2017. After receiving no supporting documents, Aetna again referred the Plaintiff's records to a third-party medical review company, but this time to University Disability Consortium ("UDC"). The result of Aetna's submission to UDC was a report generated by consulting neurologist Dr. Maha Younes. Dr. Younes did concede that the Plaintiff had symptoms of PTSD and depression. Notwithstanding, Dr. Younes opined that there was not objective evidence to support that the Plaintiff had a cognitive impairment and that the treatment the Plaintiff received did not indicate that the Plaintiff had severe psychiatric symptoms. Dr. Younes' conclusion corroborated Dr. Steele's in that the medical records did not show that the Plaintiff suffered from psychiatric symptoms so severe as to cause functional impairment.

As part of the independent medical review by UDC, Aetna also received a report prepared by Dr. Paul Medrek, a board-certified doctor in occupational medicine. In rendering his conclusions, Dr. Medrek attempted to contact Dr. Van Osten multiple times but never made contact. Dr. Medrek reviewed the Plaintiff's medical records and concluded that they did not support a finding of less than sedentary work capacity as of June 5, 2016.

Aetna delayed rendering its decision and submitted Dr. Younes report to Dr. Iwueke on December 18, 2017. After two weeks with no response from Dr. Iwueke, Aetna rendered its appeal decision, upholding its determination that the Plaintiff could perform sedentary work on a full-time basis as of June 5, 2016. Aetna informed the Plaintiff of his right to sue under ERISA, and this lawsuit, wherein the Plaintiff requests an extension of his LTD benefits, followed.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little*, 37 F.3d at 1075.

*Analysis and Discussion*

In its Motion [34], the Defendant avers that this case should be dismissed because the medical evidence shows that the Plaintiff cannot establish that his psychological and physical conditions render him incapable of engaging in any reasonable occupation as required by the Policy. As noted above, to have qualified for LTD benefits beyond the initial 24-month term, the Plaintiff must have shown that he could not engage in any reasonable occupation, as defined by the Policy. However, now that the benefits have been terminated, to succeed in this case, the

9

Plaintiff must show that Aetna abused its discretion in the termination of his benefits. *Atteberry v. Mem'l-Hermann Healthcare Sys.*, 405 F.3d 344, 347 (5th Cir. 2005); *Vega v. Nat'l Life Ins. Servs., Inc.*, 188, F.3d 287, 295 (5th Cir. 1999).

When determining whether an administrator was justified in denying benefits under an ERISA plan, the standard of review depends on whether the ERISA plan gives the administrator discretion in construing the plan's terms. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S. Ct. 948, 954, 103 L. Ed. 2d 80 (1989) (citing 3 W. Fratcher, Scott on Trusts § 187, p. 14 (4th ed. 1988)). When an ERISA plan does not vest the discretion in the administrator of the plan, *de novo* review of the decision is necessary. *Firestone Tire & Rubber Co.*, 489 U.S. at 101. Alternatively, when an ERISA plan vests the discretion in the administrator, the administrator's decision will be upheld barring an abuse of discretion. *Atteberry*, 405 F.3d at 347; *Vega*, 188, F.3d at 295. Here, the plan vests discretion in the administrator, Aetna.[2] Therefore, the Court will operate under the abuse of discretion standard of review.

When making an abuse of discretion determination, courts can apply a two-part test. *Gosselink v. Am. Tel. & Tel.*, Inc., 272 F.3d 722, 726 (5th Cir. 2001). In employing the two-part test, the Court must first determine whether the administrator's decision to terminate benefits was legally correct. *Id.* Second, if the Court determines that the administrator did not give the legally correct interpretation to the policy, then the Court must determine whether the administrator abused its discretion. *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998). However, application of the two-step analysis in these cases is not an absolute rule. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 (5th Cir. 1994). "[T]he reviewing court is not rigidly confined to this two-step analysis in every case." *Id.* Therefore, the Court can bypass the legally correct determination

---

[2] "We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits." [24].

of the two-part test if it can more readily determine whether the administrator abused discretion in denying the claim. *Porter v. Lowe's Companies, Inc.'s Bus. Travel Acc. Ins. Plan*, 731 F.3d 360, 364 (5th Cir. 2013) (citing *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009)). Thus, should the Court decide to bypass the legally correct prong of the analysis, it would automatically make an abuse of discretion determination based on the evidence presented in the record and the arguments of the parties. *See* Porter, 731 F.3d at 366.

When applying the abuse of discretion standard, the Court should analyze "whether the plan administrator acted arbitrarily or capriciously." *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992) (citing *Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990)). Furthermore, if the Court determines that the plan administrator's fiduciary decision is not arbitrary or capricious and is supported by substantial evidence, then the decision must prevail. *Porter* 731 F.3d at 364 (citing *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir.2004)). A decision is arbitrary only if "made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (citing *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir. 1996)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Spenrath v. Guardian Life Ins. Co. of Am.*, 564 F. App'x 93, 97 (5th Cir. 2014) (citing *Ellis* 394 F.3d at 273). Furthermore, when reviewing the administrator's decision, the Court need not go through a convoluted analysis; the Court must only analyze whether the administrator's decision "falls somewhere on a continuum of reasonableness — even if on the low end." *Corry v. Liberty Life Assur. Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007) (citing *Vega*, 188 F.3d at 297).

The Court additionally notes that whenever an administrator of a plan determines both eligibility and simultaneously pays the benefits out of its own pocket, an inherent conflict of interest arises. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008); *see also Wittmann v. Unum Life Ins. Co. of Am.*, 793 F. App'x 281, 285 (5th Cir. 2019). In such a circumstance, the reviewing court should consider that conflict of interest as a factor in concluding whether abuse of discretion has occurred in the denial of benefits. *Metro. Life Ins Co.*, 554 U.S. 105 at 108. However, the weight that factor should be given "varies on a case-by-case basis." *Wittmann v. Unum Life Ins. Co. of Am.*, 793 F. App'x 281 at 285 (citing *Metro. Life Ins Co.*, 554 U.S. 105 at 117-18; *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 459 (5th Cir. 2014)). Notwithstanding, the Plaintiff bears the burden of proving that the administrator arbitrarily and capriciously denied the coverage. *Spenrath*, 564 F. App'x at 97.

Here, as explained above, after the initial termination decision, the Plaintiff filed two appeals. Because different evidence was available to Aetna when it made its determination at these three stages, the Court will separately address the initial termination decision and the two subsequent affirmations.

    *A.    Initial Termination Decision*

The Plaintiff undoubtedly suffered some physical and mental hardship because of his injury and, as a result, was granted LTD benefits starting in June 2014. However, as the facts show, Aetna began to review the Plaintiff's benefits in October 2015 pursuant to the "any reasonable occupation standard" since the initial 24-month LTD benefits period was set to expire in June 2016. In conducting this analysis, Aetna first analyzed updated medical records which it received from Dr. Iwueke on October 27, 2015. These records indicated that the Plaintiff had participated in a mental status examination which showed that he had normal speech, linear and logical thought content,

12

no abnormal thoughts, intact associations, fair judgement, intact memory, fair attention span and knowledge, and full affect. Second, Aetna received medical records in February 2016 from Dr. John White who had conducted an evaluation on October 9, 2015. Said evaluation concluded that while the Plaintiff could not drive commercially, kneel or squat, he could return to modified work. Dr. White found no restrictions in lifting, standing, walking, or sitting even though orthotic footwear was recommended. Thereafter, Aetna referred the Plaintiff's medical records for the internal complex triage to assess his ability to do seated work activity. Aetna's medical director, Dr. Brodie, reviewed the Plaintiff's medical records and concluded that he could sustain seated activities and was not restricted in his upper extremities. Thereafter, Dr. Van Osten affirmed Dr. Brodie's findings that the Plaintiff could return to any reasonable occupation full-time, with a sedentary work capacity.

After establishing a medical consensus of the Plaintiff's sedentary functional capacity, Aetna then conducted the TSA which yielded that there were a myriad of jobs the Plaintiff could do. These included four sedentary occupations that were especially tailored to the Plaintiff's needs and met the requisite wage requirement. Therefore, taking the totality of the evidence into consideration, Aetna terminated the LTD benefits.

The Court exercises its discretion in foregoing the first prong of the two-part test used by many courts in ERISA cases. *See Porter* 731 F.3d at 364; *see also Duhon*, 15 F.3d at 1307. The Court does so because it finds that the evidence in the record, on its face, is enough to ascertain whether an abuse of discretion occurred. *See Porter* 731 F.3d at 364. [3] Therefore, in reference to

---

[3] "[T]his court can bypass, without deciding, whether the determination was legally correct, and move directly to whether the determination was an abuse of discretion." *Porter* 731 F.3d at 366. The Court in *Porter* went on to make its determination solely based on the record and arguments made by the parties operating under the guise that the evidence "need only assure that the administrator's decision fall somewhere on the continuum of reasonableness." *Id.* at 364.

13

the initial termination decision, the question becomes whether Aetna's decision was arbitrary and capricious so as to constitute an abuse of discretion. *Id.* The Fifth Circuit has held that a decision in this context is arbitrary if "made without a rational connection between the known facts and the decision." *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215 *(*citing *Bellaire Gen. Hosp.*, 97 F.3d at 828). Here, multiple medical professionals all independently came to a consensus that the Plaintiff was physically able to participate in sedentary work. In addition to the Plaintiff's physical capacity being rendered sedentarily capable, Dr. Iwueke's updated medical records indicated that his phycological condition was not so debilitated that he could not work in the sedentary range. At the outset of Aetna's review, the most recent mental status evaluation conducted by Dr. Iwueke indicated that the Plaintiff exhibited normal speech, linear and logical thought content, no abnormal thoughts, intact associations, fair judgment, intact memory, fair attentions pan and knowledge and full affect. Notwithstanding, Dr. Iwueke's prognosis on the cited mental status evaluation was still major depression and PTSD. However, even taking Dr. Iwueke's prognoses into account, the Court finds that Aetna's initial decision to terminate was not arbitrary or capricious because it was based on a rational connection to the known facts. *See Meditrust Fin. Servs. Corp.*, 168 F.3d at 215.

Although the Plaintiff's Complaint [1] contains claims regarding his disability, and Dr. Iwueke's prognoses attempt to substantiate that claimed disability, it is well settled that Aetna does not have a duty to give credit to unsubstantiated claims regarding disability. *Schultz v. Progressive Health, Life, & Disability Benefits Plan*, 380 F. Supp. 2d 780, 787 (S.D. Miss. 2005) (citing *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 334 (5th Cir.2001)). The medical evidence, pertinent to both the Plaintiff's physical and mental condition, supported that he had the capacity for sedentary work levels. Additionally, the TSA found sedentary occupations at the

14

requisite wage levels in his labor market. Having reviewed the substantial medical evidence that was in Aetna's possession, the Court finds that there was undoubtedly substantial evidence that a reasonable person would agree Aetna's decision was supported. *See Spenrath*, 564 F. App'x at 97; *see also Ellis*, 394 F.3d at 273. Furthermore, the decision certainly "falls somewhere on a continuum of reasonableness" and therefore the Court finds there was no abuse of discretion in the initial termination. *Corry*, 499 F.3d at 398 (citing *Vega*, 188 F.3d at 297).

### B.  *Subsequent Appeals*

The Court will next address whether Aetna's decisions as to the Plaintiff's appeals constituted an abuse of discretion, in light of the new evidence that was presented. *See Porter*, 731 F.3d at 364 (holding the administrator's decision should be supported by substantial evidence).

In addressing the first appeal of the LTD benefits termination, the Court notes that additional evidence was gathered by Aetna for the record. The appeal process allowed the Plaintiff to submit any documentation he wished to support his claim for benefits. Aetna obtained additional records from Dr. Iwueke that, as the facts suggest, claimed that the Plaintiff could not work because of his depression and PTSD. There were also records obtained from family medicine doctor, Dr. Moore. Dr. Moore's records indicated that the Plaintiff did not exhibit physical pain and he denied having depression during those visits. Aetna submitted these medical records to RRS for third-party review. The Court notes that Aetna was not required to do so under the Policy. The RRS review indicated that Dr. Iwueke's findings were unfounded.

In reference to the second appeal, the Plaintiff submitted no additional documentation. However, in what appears to be a good faith effort to conduct a comprehensive review of the records, Aetna again solicited the services of another third-party medical record review company, UDC. The reports that resulted therein corroborated the RRS review from the first appeal. The

conclusion of both third-party reviews, which were conducted completely independent of one another, was effectively that the Plaintiff could not establish that he was disabled to the extent that he could not perform any reasonable occupation. The Court finds that Aetna went over and above what was necessary to give the Plaintiff the opportunity to supplement his alleged level of disability. Thus, viewing the totality of the evidence, the inquiry becomes whether or not Aetna acted arbitrarily and capriciously so as to constitute an abuse of discretion in upholding its decision to deny benefits.

Aetna allowed the Plaintiff to appeal their termination decision twice. Then, Aetna referred the review of the Plaintiff's medical records to two separate medical record reviewing companies. Both reviews had effectively the same conclusions and affirmed that Aetna had made correct decision in terminating the Plaintiff's benefits because he could not meet the any reasonable occupation standard as required by the Policy. The termination was, in the Court's view, certainly made with a rational connection to the known facts and the decision and also falls on the continuum of reasonableness. *See Corry*, 499 F.3d at 398. The decision is furthermore supported by substantial evidence. *See Spenrath*, 564 F. App'x at 97 (holding that substantial evidence in this context is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Therefore, the Court finds that Aetna did not act arbitrarily or capriciously at any point in terminating the Plaintiff's benefits.

   *C.  Additional Consideration as to Conflict of Interest*

Lastly, as noted above, it is well-settled that an inherent conflict of interest exists when, as here, a plan administrator also has discretion to terminate benefits. *Metro. Life Ins Co.*, 554 U.S. 105 at 108. That dual role and the conflict of interest that arises thereof should be considered a factor when determining whether an abuse of discretion has occurred. *See id.* at 113; *see also*

16

*Wittmann*, 793 F. App'x 281 at 285. However, the weight that factor should be given "varies on a case-by-case basis." *Wittmann*, 793 F. App'x 281 at 285 (citing *Metro. Life Ins Co.*, 554 U.S. 105 at 117-18; *McCorkle*, 757 F.3d at 459).

There is no evidence that Aetna conducted itself in bad faith or with an intent to wrongfully deny the benefits. Rather, it appears to the Court that Aetna went over and beyond what was required of it, in order to give the Plaintiff every opportunity to make his case for the continuation of his LTD benefits. After doing so, Aetna made its decision based on a general medical consensus combined with the fact that sedentary employment options existed in the Plaintiff's labor market that met the requisite wage requirement. Although cognizant of the inherent conflict of interest, the Court finds that it should be given little weight in this case.

## *Conclusion*

The Court finds that Aetna is entitled to judgment as a matter of law. Therefore, the Defendant's Motion for Summary Judgment [34] is GRANTED. All claims are dismissed *with prejudice*. This CASE is CLOSED.

SO ORDERED this, the 23rd day of October, 2020.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE